CARRIE H. BACKUS and Others v. THOMAS F. CONROY and Others.[1]

May 15, 1908.

Nos. 15,535—(48).

**Ditch—Evidence.**

    The conclusion of the trial court that certain lands bordering on Bald Eagle lake will be damaged by the construction of a certain judicial ditch is not sustained by the evidence. New trial granted.

Petition for the construction of a certain ditch. The reports of the engineer and of the viewers having been made, the matter came on for final hearing before the district court for Ramsey county, Kelly, J., who denied the petition. From an order denying a motion for a new trial, petitioners appealed. Reversed and new trial granted.

*George L. Spangler,* for appellants.

*Charles J. Berryhill,* for respondents.

LEWIS, J.

In May, 1905, certain interested landowners petitioned for a judicial ditch to be laid out partly in Washington county, and partly in Ramsey county, the source of the ditch to be in Rice or Mud creek, in the southwest quarter of section 6, township 30 north, of range 21, running thence southerly along the course of Rice creek to its junction with Pine Tree creek, and from thence, as nearly as practicable, along said creek to the point where it empties into Bald Eagle lake. An engineer was appointed, who surveyed the ditch and made his re-

---

1 Reported in 116 N. W. 484.

port. Viewers were then appointed, who took into consideration all of the lands which they deemed to be benefited or damaged, and they reported that a total of one thousand acres of land would be benefited by the proposed ditch, that the total benefits resulting from its construction would be $1,983.92, and that the estimated cost and expense would be of public utility, and practicable for the reason that it would practically follow the natural course of a creek which was the outlet of Rice lake and flowed into Bald Eagle lake, and that the improvement would restore to cultivation a large area of agricultural land. The report of the viewers was duly brought on for hearing before one of the judges of the district court of Ramsey county, at which time the owners of certain lands bordering on Bald Eagle lake appeared and objected to the proceedings, on the ground that the construction of the ditch as proposed would result in raising the level of the waters of Bald Eagle lake to such an extent as to overflow their lands, and thus cause them damage. A large amount of evidence was taken, pro and con, on this question, and the court found as follows:

"* * * There is no sufficient outlet through Bald Eagle lake for the waters said ditch will carry to it, and that to carry the water from the lands proposed into said lake will have the effect of raising the surface of said lake above its ordinary altitude, and will in consequence overflow the lands of the objectors otherwise valuable for meadows which lie along the border of said lake (said objectors are riparian owners), and to the serious damage of each of them; that said report of the viewers cannot be confirmed because it takes no notice or account of said damages resulting to said objectors."

For which reasons the relief demanded in the petition was denied, and petitioners appealed their case to this court.

From the viewers' report, which forms a part of the record, it appears that the lands bordering on Bald Eagle lake were not taken into consideration by the viewers in determining the question of benefits. We shall assume, for the purposes of this case, that the omission on the part of the viewers to consider the lands represented by the objectors was not such a defect as required the court to resubmit the matter for a rehearing, and we shall assume that the trial court was justified at the hearing upon the report of the viewers in proceeding to receive the evidence of the objectors, and in determining upon the

entire record whether or not the damages were in excess of the bene-
fits. The court, having proceeded to receive the evidence of the ob-
jectors, could not have intended to deny the petition upon the ground
that the viewers had failed to consider those lands. It follows that
the only question upon this appeal is whether or not the findings of
the trial court are sustained by the evidence to the effect that the lands
of the objectors would be injured to such an extent that the entire
damage caused by prosecuting the enterprise would be in excess of
the benefits, and that no public utility would be obtained.

Mr. Irvine, the engineer who surveyed the ditch, testified that the
ordinary level of Bald Eagle lake was 215 feet, and for that reason
he established the outlet of the ditch at that level, but that at the time
he made his survey, February 25, 1906, the level of the lake was 217.6
feet. The learned trial court assumed that the average level of Bald
Eagle lake was 217.6 feet above the zero mark at St. Paul, which was
the accepted standard in that locality. From this fact the court drew
the conclusion that the lake must have been at a very much higher
point during the later period in 1906, when a heavy rainfall took place.
In thus assuming 217.6 feet to be the average level of the lake the court
was clearly mistaken. Mr. Caulfield, secretary of the board of water
commissioners of the city of St. Paul, testified that the high-water
mark during the summer of 1906 was 217.8 feet, and that the natural
outlet of Bald Eagle lake was about 214.6 feet; that in 1899 the board
of water commissioners constructed an artificial canal from Bald Eagle
lake to Otter lake, a short distance west, placing the bottom of the flume
at 216.6 feet. This flume was intended to take off a part of the sur-
plus water when the lake should reach a height of more than two feet
above the natural outlet. Mr. Caulfield testified that the lake could
vary in height about two feet above the natural outlet without over-
flowing. The testimony of these two witnesses comprises the entire
evidence as to the level of the lake compared with the St. Paul standard.

Many of the objectors testified that during the summer of 1906 their
lands were overflowed and the hay crop damaged to a considerable
extent. Some of them testified that to a limited extent the same con-
dition existed during the summer of 1905, but all of the objectors con-
curred in the view that it was only during excessive rainy periods that
the lands had been overflowed. Certain witnesses testified that, going

back a period of twenty five or thirty years, those lands had not been overflowed, except once or twice during excessive and unusual rainy periods. The point made by all of the objectors was that, if the ditch was constructed as proposed, it would add to the difficulty already existing at high-water periods to the extent that would result from the waters coming down the ditch more rapidly than in the natural way.

It conclusively appears that the proposed improvement does not extend the natural watershed which is drained by the creeks mentioned. The object of the improvement is to straighten and deepen the creeks which constitute the natural drainage outlet for that watershed, thus lowering the general water level to such an extent that the present undrained land will be restored to cultivation. Mr. Rundlett, the city engineer of the city of St. Paul, Engineer Irvine, who laid out the ditch, and other witnesses called on behalf of the petitioners, all testified that Mud lake was the only permanent body of water to be drained by the improvement. It was shown that this lake was about eight feet deep, that it was proposed to drain it to the extent of six feet, and that, if all of the waters thus removed from that lake were emptied into Bald Eagle lake at one time, the effect would be to raise the lake to the extent of 2.11 inches only. The dimensions of the proposed ditch are about as follows: Four feet wide at the bottom, and from two to four feet deep, with very sloping sides. The effect would be to lower the water level from two to four feet, and thus make available for cultivation seven hundred forty acres of land.

In our opinion it was clearly established by the evidence that after the water in Mud lake and the saturated country within the watershed is drained off, and the natural water level lowered as proposed, no more water would be precipitated into Bald Eagle lake than formerly. As a necessary result of straightening and deepening the channel, the waters would find their way to the lake more rapidly than before, and it is possible that, if no care was taken to avoid it, the water level in Bald Eagle lake might be at such a critical stage that the additional waters, if let in at one time, might tend to overflow the objectors' land. Such a contingency is highly conjectural, however. It was shown that the lands of the objectors lie about one and one half feet above the natural level of the lake. If those lands have not been overflowed in the past except during exceptionally high water periods, there is no

reasonable probability that damage will be caused to them in the future by the mere fact that the creeks have been straightened and deepened as proposed. Even if the waters are accelerated in their passage, it does not follow that they will cause damage to the lands in question at times when the whole country is flooded, and all the watercourses overflowed. In all drainage propositions some inconvenience, and possibly some damage, must occur to some parties, as was remarked in Oftelie v. Town of Hammond, 78 Minn. 275, 279, 80 N. W. 1123. A possible temporary inconvenience should not stand in the way of improvements of this character.

The petitioners are entitled to the benefit of the improvement, unless the objections to it are of substantial character. The creek which it is proposed to straighten and deepen is the natural outlet for the waters annually falling upon the petitioners' lands, and, if they cannot receive relief in this manner, none is available to them. If the objectors suffer loss at times when the whole country is suffering from a surplus of water, they have open to them the remedy of securing the widening and straightening of the outlet from Bald Eagle lake. The legislature has expressed the opinion by an independent section in the drainage act that its provisions are to be liberally construed. Results obtained from drainage enterprises are of vast public importance, as well as of special benefit to those immediately concerned.

We are of the opinion that the evidence does not sustain the findings and conclusions of the learned trial court, for which reason a new trial must be granted.

So ordered.